Johnny WALLEY *v.* STATE of Arkansas

CR 02-1002 112 S.W.3d 349

Supreme Court of Arkansas
Opinion delivered June 12, 2003

588

*John Wesley Hall, Jr.*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Vada Berger*, Ass't Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. On May 23, 2002, a jury found Johnny Walley guilty of possession of

drug paraphernalia with intent to manufacture and possession of a controlled substance, methamphetamine. He was sentenced to serve a total of eight years' imprisonment in the Arkansas Department of Correction. Walley raises the following five points on appeal: (1) the circuit court erred in denying his motion for a directed verdict because the State failed to prove actual or constructive possession; (2) the circuit court erred in overruling his objection to the trial being held in a courtroom located in the same building as the jail and the sheriff's office; (3) the circuit court erred in refusing his proffered jury instructions; (4) the circuit court erred in denying his motion to suppress the evidence seized from his house after it was searched pursuant to a warrant; and (5) the circuit court erred in denying him bail pending appeal. We find no merit to any of his points for reversal and affirm.

On September 25, 2000, Arkansas Forestry Commission agent Larry Reinhart found five trash bags, containing what he believed to be drug paraphernalia, dumped alongside a road. He notified Terry Clark, a narcotics investigator for the Thirteenth Judicial District Drug Task Force. Agent Clark examined the trash and found what appeared to be discarded supplies from a drug lab along with a receipt from Wal-Mart for the purchase of some items that could be used to manufacture methamphetamine. After determining that the Wal-Mart purchases were made with Walley's credit card, Clark went to Walley's rented residence in El Dorado. Walley answered the door, and Clark pretended to be interested in renting the residence. Shortly thereafter, Clark obtained a municipal arrest warrant for Walley on charges of littering. Clark and Russell Lamb, a deputy with the Union County Sheriff's Office assigned to the Thirteenth Judicial Drug Task Force, attempted to serve the warrant, but no one was home, and the door was padlocked. Clark could smell an odor he recognized as distinctive of a methamphetamine lab emanating through a broken window in the door of the residence. Clark spoke with Walley's landlord and neighbor, who told him she had heard that some people were "cooking dope" at Walley's house. The landlord also stated there had been an unusual amount of traffic at the house. Clark then looked into a burn barrel located at the back of the property. Upon finding more drug paraphernalia in the barrel and also smelling the odor of a methamphetamine lab at the back of the residence, Clark left Lamb at the scene and obtained a search warrant.

On March 14, 2001, Walley was charged on five drug-related counts. Prior to trial, the circuit court denied Walley's motion to suppress the evidence seized during the search of his residence. On May 23, 2002, Johnny Walley was sentenced to serve eight years' imprisonment in the Arkansas Department of Correction following a jury trial on May 20-21. The jury convicted him of possessing drug paraphernalia with intent to manufacture and possession of a controlled substance, methamphetamine. He was found not guilty of manufacturing methamphetamine. The charges of maintaining a drug premises and simultaneous possession of drugs and firearms were nolle prossed prior to trial. Walley filed a timely notice of appeal.

## I. Constructive Possession

In his directed-verdict motion after the State's case-in-chief, Walley argued, as he does on appeal, that the State did not present sufficient evidence to the jury to meet its burden of proving beyond a reasonable doubt that Walley was in actual or constructive possession of the items seized during the search of his residence. Therefore, he contends that the circuit court erred in denying his motion for a directed verdict.

A motion for a directed verdict is a challenge to the sufficiency of the evidence. *Smith v. State*, 352 Ark. 92, 98 S.W.3d 433 (2003). The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.* Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. *Id.* When reviewing a challenge to the sufficiency of the evidence, the evidence is viewed in the light most favorable to the verdict, and only evidence supporting the verdict will be considered. *Id.* Furthermore, "[a] jury need not lay aside its common sense in evaluating the ordinary affairs of life, and it may infer a defendant's guilt from improbable explanations of incriminating conduct." *Burley v. State*, 348 Ark. 422, 431, 73 S.W.3d 600, 606 (2002); *Terrell v. State*, 342 Ark. 208, 27 S.W.3d 423 (2000); *Goff v. State*, 329 Ark. 513, 953 S.W.2d 38 (1997); *Davis v. State*, 325 Ark. 96, 106, 925 S.W.2d 768, 773 (1996) ("A jury is not required to believe all or any part of a defendant's or witness's state-

ment, and is entitled to draw upon common sense and experience in reaching its verdict.").

Walley was found guilty of possession of methamphetamine under § 5-64-401(c) of the Arkansas Criminal Code: "It is unlawful for any person to possess a controlled substance . . . ." Ark. Code Ann. § 5-64-401(c) (Supp. 2001). He was also found guilty of possession of drug paraphernalia with intent to manufacture methamphetamine under § 5-64-403(c)(2)(A): "It is unlawful for any person to . . . possess . . . drug paraphernalia, knowing, or under circumstances where one reasonably should know, that it will be used to . . . manufacture . . . a controlled substance . . . ." Ark. Code Ann. § 5-64-403(c)(2)(A) (Supp. 2001).

 We recently explained how we conduct an appellate review in connection with a sufficiency-of-the-evidence challenge to possession when two or more persons occupy the residence where the contraband was found:

> Under our law, it is clear that the State need not prove that the accused physically possessed the contraband in order to sustain a conviction for possession of a controlled substance if the location of the contraband was such that it could be said to be under the dominion and control of the accused, that is, constructively possessed. *Heard v. State*, 316 Ark. 731, 876 S.W.2d 231 (1994); *Crossley v. State*, 304 Ark. 378, 802 S.W.2d 459 (1991). We have further explained:
>
> > Constructive possession can be implied when the controlled substance is in the joint control of the accused and another. Joint occupancy, though, is not sufficient in itself to establish possession or joint possession. There must be some additional factor linking the accused to the contraband. The State must show additional facts and circumstances indicating the accused's knowledge and control of the contraband.
>
> *Hendrickson v. State*, 316 Ark. 182, 189, 871 S.W.2d 362, 365 (1994) (citations omitted). *See also Jacobs v. State*, 317 Ark. 454, 878 S.W.2d 734 (1994); *Nichols v. State*, 306 Ark. 417, 815 S.W.2d 382 (1991). When seeking to prove constructive possession, the State must establish (1) that the accused exercised care, control, and management over the contraband, and (2) that the accused knew the matter possessed was contraband. *Darrough v.*

*State*, 322 Ark. 251, 908 S.W.2d 325 (1995); *Plotts v. State*, 297 Ark. 66, 759 S.W.2d 793 (1988).

*Darrough v. State*, 330 Ark. 808, 811, 957 S.W.2d 707, 708-09 (1997). *Darrough v. State* is consistent with a long line of cases holding that "it cannot be inferred that one in non-exclusive possession of premises knew of the presence of drugs and had joint control of them unless there were other factors from which the jury can reasonably infer the accused had joint possession and control." *Ravellette v. State*, 264 Ark. 344, 346, 571 S.W.2d 433, 434 (1978). In *Ravellette*, we held that where marijuana was found in a living room and dining room of a rented house jointly shared, there must be some factor in addition to the joint control of the premises to link the accused with the controlled substance. *Id.; see also Hicks v. State*, 327 Ark. 652, 659, 941 S.W.2d 387, 391 (1997); *Pyle v. State*, 314 Ark. 165, 862 S.W.2d 823 (1993); *Bailey v. State*, 307 Ark. 448, 821 S.W.2d 28 (1991); *Embry v. State*, 302 Ark. 608, 611, 792 S.W.2d 318, 319 (1990); *Plotts v. State*, 297 Ark. 66, 759 S.W.2d 793 (1988); *Westbrook v. State*, 286 Ark. 192, 194, 691 S.W.2d 123, 124 (1985); *Osborne v. State*, 278 Ark. 45, 643 S.W.2d 251 (1982).

Walley does not dispute the fact that he rented the residence, purchased the padlocks for the residence, and maintained his El Dorado office in the residence. Thus, the issue is whether the State presented the jury with additional evidence linking Walley to the contraband. The instant case is distinguishable from those cases in which the jury was asked to find that the accused possessed the contraband based on the discovery of a small cache of drugs in the residence. *See, e.g., Ravellette v. State, supra.* Instead, the jury was presented with evidence of an operational methamphetamine lab in the kitchen. Agent Clark described in great detail the items seized from Walley's residence. During the search, the agents discovered numerous items used for the manufacture of crystal methamphetamine including: matchbook striker plates soaking to remove the red phosphorus, jars containing iodine crystals, jars containing two layer liquids (later identified as including methamphetamine), a measuring cup with the residue from ephedrine tablets, along with organic solvents and heat lamps for drying the drugs. The cabinets and tables were stained from the chemicals, and the kitchen windows were covered with black plastic. Drug paraphernalia was also found in a burn barrel near

the residence and in the trash can on the back porch, indicating an ongoing drug manufacturing process. Agent Clark testified that he could smell the odor of the lab from outside the residence, and that the first officers in the house opened the windows to permit fumes to escape before allowing the full search team into the residence. While the cabinets were locked, Walley testified that the keys were kept hanging in the kitchen on the wall. From these facts alone, the jury could reasonably conclude that Walley knew of the existence of the drugs and drug manufacturing paraphernalia in the kitchen of his residence. The jury did not have to believe Walley's testimony that he did not notice the smell in the house, did not notice the stains in the kitchen, did not notice the black plastic on the windows, and did not know what was in the locked cabinets.

The jury was, however, presented with even more evidence linking Walley to the methamphetamine lab. The trash bags that originally alerted the drug task force to the existence of an illegal drug lab included a receipt from Wal–Mart that listed several items used to manufacture crystal methamphetamine including Insto chlor, bubble stone, and silicone. During the residence search officers found Jungle Insto-chlor, Aqua Aquarium Bubble stone, and a tube of silicone — items listed on the Wal–Mart receipt. By tracing the receipt through Wal–Mart's records, Agent Clark was able to determine that the items were purchased with Walley's credit card. The jury was also presented with documents obtained from Walley's office in the residence identifying Walley and his business, including a U.S. Postal request that his mail be forwarded to a local Mail Boxes, Etc. and checks for Walley's business, Mid–South Directional, listing the Mail Boxes, Etc. address as the business address. Monitors for a sophisticated video and audio surveillance system allowing him to see and hear anyone approaching the residence and a police scanner allowing him to monitor police activities were also found in his office at the residence.

██ ██ Walley testified in his own behalf and offered exculpatory explanations for the items found in his office and denied any knowledge of the contraband; however, the jury was not required to believe Walley's statements. *Davis v. State*, 325 Ark. 96, 106, 925 S.W.2d 768, 773 (1996). Based on our analysis of the facts viewed in the light most favorable to the jury's verdict, we conclude that there was sufficient evidence linking Walley to

the contraband from which the jury could conclude that Walley had knowledge of and control over the contraband. Therefore, we affirm the circuit court's denial of Walley's motion for a directed verdict.

## II. The Location of the Trial

 The trial was conducted in a courtroom located in the Union County Criminal Justice Facility rather than in the Union County Courthouse. Walley complains that holding the trial at the facility deprived him of his right to a fair trial "because of the appearance of guilt it created." The parties stipulated that at the time of trial, the building was being renovated so the jurors had to walk past a chain-link fence topped with razor wire and go down a hallway past the jail before coming upon the foyer of the Sheriff's Office and the entrance to the courtroom. Although we have not addressed the specific issue of whether the location of the courtroom can be prejudicial, certain criteria for analysis can be drawn from similar issues in other cases. In a case involving the presence of uniformed officers in the courtroom, this court stated the general principle:

> Whenever a courtroom arrangement is challenged as inherently prejudicial the question is not whether the jurors expressed a consciousness of some prejudicial effect, but rather whether an unacceptable risk of prejudicial effect is presented. This is a matter to be given close scrutiny by the reviewing court.

*Clemmons v. State*, 303 Ark. 265, 267, 795 S.W.2d 927, 928 (1990).

Walley suggests that the location of the courtroom was inherently prejudicial, because it created an appearance of guilt similar to that created where a defendant is forced to wear prison garb or is placed in shackles during trial. *Box v. State*, 348 Ark. 116, 71 S.W.3d 552 (2002); *Miller v. State*, 249 Ark. 3, 457 S.W.2d 848 (1970) (defendant may not be forced to wear prison garb during trial); *see also Parker v. State*, 300 Ark. 360, 779 S.W.2d 156 (1989) (allowing a plexiglass divider between the daughters of a murder victim and the defendant, who was proceeding *pro se*); *Moore v. State*, 299 Ark. 532, 773 S.W.2d 834 (1989) (finding prejudice where the State purposely placed a cadre of uniformed police officers inside the rail during closing arguments). These cases are

clearly distinguishable in that prejudice has only been found where the circumstances were specific to the accused and implied that this particular defendant was a dangerous criminal. Prison garb, handcuffs, and the position of the uniformed officer are all circumstances that specifically relate to the defendant on trial. Walley offers no evidence of anything about the arrangement inside the courtroom itself that was specifically prejudicial to him. He only complains of the location of the courtroom.

Walley concedes in his brief that he could find no authority for his contention that the location of the courtroom was inherently prejudicial. Walley, therefore, must show actual prejudice in order to prevail on his fair-trial claim. This he has failed to do. The courtroom had the appearance of any other courtroom. There were no special security devices in the courtroom, and Walley was not handcuffed, forced to wear prison garb, or surrounded by armed and uniformed officers. Moreover, there is no indication in the verdict that he was prejudiced by the courtroom's location. Walley was acquitted of one of the charges against him and convicted of a lesser-included offense on one of the remaining two charges. He did not receive the maximum sentence allowed by law. Furthermore, the circuit court gave the following curative instruction to the jury:

> This case is being tried in a courtroom which is attached to the sheriff's office and jail. It is not to be considered by you as a reflection of what the Court thinks [a]bout this case. Under no circumstances shall this be considered by you in arriving at your verdict or considered by you as evidence in this case.

Walley has failed to establish that the location of the courtroom in the same facility as the jail and the sheriff's office was in any way more prejudicial to him than a courtroom located in the courthouse. Based on this record and the circuit court's curative instruction to the jury, we cannot say that holding the trial at the Union County Criminal Justice Facility deprived Walley of his right to a fair trial. The circuit court's ruling on this point is affirmed.

### III. Proffered Jury Instructions

Walley contends that AMI Crim. 2d 6404 incorrectly states the law on constructive possession and is in conflict with this court's

case law. For that reason, he concludes that the trial court erred in rejecting his proffered jury instructions on constructive possession. He further argues that, because the model jury instruction is an incorrect statement of the law, prejudice is presumed.

The circuit court instructed the jury as follows:

### INSTRUCTION NO. 16

To sustain this charge [possession of methamphetamine] the State must prove the following beyond a reasonable doubt:

First: That Johnny Walley possessed methamphetamine, and

Second: That he did so knowingly.

### INSTRUCTION NO. 17

Johnny Wall[e]y is charged with the offense of possession of drug paraphernalia with the intent to manufacture. To sustain this charge the State must prove beyond a reasonable doubt that:

Johnny Walley possessed drug paraphernalia with the intent to manufacture knowing or under circumstances where one reasonably should have known that it will be used to manufacture, compound, produce or possess a controlled substance.

### INSTRUCTION NO. 18

There are two kinds of possession, actual and constructive. Actual possession of a thing is direct physical control over it. Constructive possession exists when a person although not in actual possession of a thing has the right to control it and intends to do so, either directly or through another person or persons. If two or more persons share actual or constructive control, either or both may be found to be in possession.

The circuit court's instructions on possession complied with AMI Crim. 2d 6404. Walley proffered the following instruction:

Where there is joint occupancy of the premises where contraband is found, some additional factor must be present linking the accused to the controlled substances to find beyond a reasonable doubt that he possessed a controlled substance.

To prove possession of a controlled substance, the State must prove beyond a reasonable doubt: (1) that the accused exercised care, control, and management over the controlled substances and

(2) that the accused knew the matter he possessed was a controlled substance.

As an alternate instruction, Walley proffered the second paragraph quoted above separately.

 Walley's proffered instructions were based on our cases setting out the framework under which we analyze the sufficiency of the evidence where controlled substances have been found in residences occupied by more than one person. Under that case law, the proffered instructions may be correct statements of the law. *See, e.g., Darrough v. State, supra.* However, just because a proffered jury instruction may be a correct statement of the law does not mean that a circuit court must give the proffered instruction to the jury. *Henderson v. State,* 284 Ark. 493, 684 S.W.2d 231 (1985). In fact, a non-AMI instruction is only to be given when the AMI instruction does not correctly state the law or where there is no AMI instruction on the subject. *Id.; Re: Arkansas Model Criminal Instructions,* 264 Ark. 967 (1979) (per curiam).

 In addressing a similar argument, we have held that the wording of AMI Crim. 2d 6404 is a legally sufficient statement of constructive possession of a controlled substance. *Holloway v. State,* 293 Ark. 438, 738 S.W.2d 796 (1987).[1] *See also Haygood v. State,* 34 Ark. App. 161, 807 S.W.2d 470 (1991) (also holding AMI Crim. 2d 6404 sufficient). Based on *Holloway* and *Haygood,* the circuit court was correct in giving AMI Crim. 2d 6404 as an instruction to the jury and rejecting Walley's proffered instructions. Nevertheless, Walley contends that this court should overrule the decision by the Arkansas Court of Appeals in *Haygood v. State, supra,* which would also require that we overrule *Holloway v. State, supra.* While we have the power to overrule prior opinions, "as a matter of public policy, [we] uphold those decisions unless a great injury or injustice would result." *Murphy Oil, USA, Inc. v. Unigard Security Insurance Co.,* 347 Ark. 167, 181, 61 S.W.3d 807, 816 (2001).

 In the instant case, Walley has not shown a great injury or an injustice that would require this court to overrule

---

[1] The *Holloway* decision was based on the language of AMI Crim. 3304, which, in the second edition of the Arkansas Model Jury Instructions, Criminal was renumbered as AMI Crim. 2d 6404 without changing the constructive possession language.

prior opinions. His proffered instructions sought first to require the jury to find some link between the accused and the contraband in addition to his occupancy of the residence. As noted above in point I, the jury was presented with sufficient evidence of such a link. Next, Walley seeks to require that the jury conclude that he exercised care, control, and management over the drugs and drug paraphernalia and that he did so knowingly. The possession instruction (Instruction No. 18) met the control requirements that Walley seeks, and Instructions Nos. 16 and 17 met the knowing requirements that Walley seeks.[2] Instruction No. 16 is a correct statement of the law on the elements the State is required to prove for possession of methamphetamine, and Instruction No. 17 is a correct statement of the law on the elements the State is required to prove for possession of drug paraphernalia with the intent to manufacture. Likewise, Instruction No. 18 is a correct statement of the law concerning actual versus constructive possession. Thus, we hold that AMI Crim. 2d 6404 continues to be sufficient, and the circuit court did not err in refusing Walley's proffered jury instructions.

### IV. Probable Cause to Search

For his fourth point on appeal, Walley argues that the circuit court erred in denying his motion to suppress all evidence seized from the September 29, 2000 search under the Fruit of the Poisonous Tree doctrine. When reviewing the circuit court's ruling on a motion to suppress evidence from a search, "we conduct a *de novo* review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court." *Davis v. State*, 351 Ark. 406, 413, 94 S.W.3d 892, 896 (2003) (citing *Ornelas v. United States*, 517 U.S. 690 (1996)). The Rules

---

[2] The Comment to AMI Crim. 2d 6404 explains that while Act 787 of 1983 removed the "knowingly or intentionally" intent requirement from Ark. Code Ann. § 5-64-401(c), our opinions have continued to require the State to prove intent, consistently with Ark. Code Ann. § 5-2-203(b) (Repl. 1997), that provides a culpable mental state in the event that a criminal code section does not. *The Intent Requirement*, Comment to AMI Crim. 2d 6404. As a result, the Arkansas Supreme Court Committee on Criminal Jury Instructions has not changed the instruction. *Id.*

of Criminal Procedure contain the following particularity requirement: "(b) The warrant shall state, or describe with particularity . . . the identity of the person to be searched, and the location and designation of the places to be searched . . . ." Ark. R. Crim. P. 13.2(b) (2002).

## A. Franks *Violation*

Walley first alleges a *Franks* violation. *Franks v. Delaware*, 438 U.S. 154 (1978). He contends that the affidavit for the littering warrant had a material omission or a recklessly false statement in that it implied that the trash found by the forester contained a receipt that identified him and his address; whereas the Wal-Mart receipt did not identify him on its face.

This argument is of no avail to Walley. Only evidence that is discovered as a result of an officer's exploitation of an illegality is subject to suppression as the fruit of the poisonous tree. *Hudspeth v. State*, 349 Ark. 315, 78 S.W.3d 99 (2002). The search was not incident to an arrest for littering. In fact, the littering arrest warrant was never served. Because no search was conducted based on the littering arrest warrant, the evidence seized could not have been the fruit of that particular tree, poisonous or not. The validity of the littering arrest warrant is simply not relevant to the suppression question.[3] None of the evidence at trial would be excluded as fruit of the poisonous tree even if the littering warrant were invalid because no arrest was made under the warrant, nor was any evidence seized pursuant to the littering arrest warrant.[4]

## B. *Probable Cause*

Walley next alleges that there was no probable cause to search because: (1) a mere reference to a chemical odor does not, standing alone, constitute probable cause; (2) conclusory state-

---

[3] Moreover, Walley has not proved the littering warrant was obtained improperly. The statement given to the magistrate was accurate, and the fact that Clark did not explain in detail each minute step taken to determine the name of the credit card holder from the Wal-Mart sales slip does not defeat the warrant.

[4] Walley also makes an assertion that the arrest warrant for littering was only a pretext to search the residence. However, we do not reach this issue because there was no search incident to the arrest warrant for littering.

ments do not support probable cause; (3) there was an expectation of privacy in the curtilage, and the landlord did not have authority to consent to a search; and (4) the landlord had no knowledge of "cooking dope" at the residence. In the determination of probable cause, courts are to be liberal rather than strict. *Bennett v. State, supra.*

 *1. Odor of a Methamphetamine Lab* — Walley is correct in stating that the odor of a legal chemical, by itself, does not constitute probable cause. *See, e.g., Bennett v. State,* 345 Ark. 48, 44 S.W.3d 310 (2001). However, the search warrant in this case was not based on the odor of a legal chemical. Agent Clark testified at the suppression hearing of his many years experience with illegal methamphetamine labs, and he testified that a methamphetamine lab has a distinctive smell. Therefore, it was not the odor of a legal chemical that tipped agent Clark off to the probable presence of a methamphetamine lab in the residence. It was rather the distinctive odor of an illegal methamphetamine lab that contributed to his probable cause. The instant case is more similar to those cases in which we have found that the odor of marijuana can be a factor supporting probable cause to search. *See Miller v. State,* 342 Ark. 213, 27 S.W.3d 427 (2000); *McDaniel v. State,* 337 Ark. 431, 990 S.W.2d 515 (1999); *Green v. State,* 334 Ark. 484, 978 S.W.2d 300 (1998); *Stout v. State,* 320 Ark. 552, 898 S.W.2d 457 (1995). In the instant case, the distinctive odor of a methamphetamine lab was a valid contributing factor in establishing probable cause.

 *2. Conclusory Statements* — Walley singles out various statements that, taken out of context, sound conclusory. However, as noted above, we view the totality of the circumstances when determining whether probable cause exists to support the issuance of a search warrant. The fact that some statements, viewed in isolation, may sound conclusory, does not defeat probable cause to search if it is otherwise supported by facts. Clark found drug paraphernalia in trash bags linked to Walley at his residence in El Dorado by the use of his credit card to purchase some of the items. Clark found drug paraphernalia in a burn barrel close to the rented residence. Also, Clark smelled the distinctive odor of a methamphetamine lab both at the front door and at the back of the residence. Thus, the search warrant was supported by more than mere conclusory statements.

■ *3. Expectation of Privacy* — Walley's claim that he had a reasonable expectation of privacy in the curtilage around his rented residence is not accurate. Walley's rental was limited to the residence itself; he shared the curtilage with the renter of the garage. A person cannot claim an expectation of privacy in property held by another, even if the person owns the property. *Hall v. State*, 326 Ark. 823, 933 S.W.2d 363 (1996). It therefore logically follows that if a person shares the use of property with another renter and the property is owned by a third party, that person does not have a protectable expectation of privacy in the common area.

■ ■ A search implicates the Fourth Amendment "when an expectation of privacy that society is prepared to consider reasonable is infringed." *Rainey v. Hartness*, 339 Ark. 293, 301, 5 S.W.3d 410, 416 (1999) (citing *United States v. Roby*, 122 F.3d 1120, 1123 (8th Cir. 1997)). Even an ownership interest may not be sufficient to establish a legitimate expectation of privacy with respect to particular items located on the premises. *Id.* When an expectation of privacy is claimed, the trial court must determine: "(1) Whether the defendant has asserted or manifested a subjective expectation of privacy, and (2) whether that expectation is objectively reasonable. Although the first prong is a question of fact, the second is one of law. Thus, even assuming that the defendant has proven a subjective expectation of privacy, in the final analysis, that expectation must be objectively reasonable." *Id.* (citations omitted). Thus, although Walley may have subjectively asserted an expectation of privacy in the area around his rented residence, that does not answer the question of whether it was objectively reasonable.

■ Driveways and walkways used to approach a residence are portions of the curtilage as traditionally defined, but under *Katz v. United States*, 389 U.S. 347, 351 (1967), the expectation of privacy in such areas is not generally considered reasonable. *See United States v. Magana*, 512 F.2d 1169 (9th Cir.), *cert. denied*, 423 U.S. 826 (1975). Whether an area outside one's home is private as opposed to public, for purposes of the Fourth Amendment, is not controlled by the common law of property. *United States v. Santana*, 427 U.S. 38 (1976). "What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." *Id.* at 42 (quoting *Katz v. United States, supra*). Neither a driveway nor a yard are *per se*

private, and, for Fourth Amendment purposes, areas outside the confines of one's home are ordinarily considered public. *See United States v. Santana, supra* (standing in one's front doorway); *United States v. Hoyos*, 892 F.2d 1387 (9th Cir. 1989), *cert. denied*, 498 U.S. 825 (1990) (standing in a backyard looking over a gate); *Duncan v. Storie*, 869 F.2d 1100 (8th Cir.), *cert. denied*, 493 U.S. 852 (1989) (leaving house voluntarily to stand on the front porch); *Johnson v. State*, 291 Ark. 260, 724 S.W.2d 160, *cert. denied*, 484 U.S. 830 (1987) (walking across the front yard); *see also Freeman v. State*, 37 Ark. App. 81, 824 S.W.2d 403 (1992); *Gaylord v. State*, 1 Ark. App. 106, 613 S.W.2d 409 (1981).

■ If an individual does not have an objectively reasonable expectation of privacy in the curtilage of one's own residence, then a person does not have an objectively reasonable expectation of privacy in the area around a rental residence, especially where, as here, a second building on the property is rented to another person who shares the curtilage with the accused. As to whether the landlord had the authority to authorize a search, we do not reach this issue because, as explained above, the landlord's authorization was not needed. The initial search was limited to the common area outside the residence where no warrant was required, and the search inside the residence was pursuant to a search warrant.

■ *4. The Landlord's Statements* — Walley focuses on the rumor repeated by the landlord that someone was "cooking dope" in his rental property. There is no proof that this second-hand rumor played any significant role in the establishment of probable cause. Walley ignores the statement by the landlord concerning the unusual amount of traffic coming and going from the residence that would support probable cause. Nevertheless, even if we completely eliminate the landlord's statements, there were still sufficient facts to support probable cause to search the residence.

### C. *Technical Errors in the Search Warrant*

Third, Wally argues that the search warrant itself was defective because there was no recordation of any sworn testimony by Clark to the judicial officer that issued the search warrant, and the address of the property was incorrectly listed as "40" instead of "440" Nick Springs Road. As an initial matter, Walley assumes that the issuing magistrate's written comment that the search war-

rant was based on an "affidavit for search warrant and sworn testimony" refers to a written affidavit and separate verbal testimony by Clark. During the suppression hearing, the issue of recordation of any verbal testimony in support of the search warrant was not raised or discussed. Clark only testified to presenting the supporting affidavit to the judge, who issued the search warrant.

 Walley next asserts that the incorrect address was enough to defeat the search warrant. A minor discrepancy in the physical description of property to be searched in a search warrant is not normally fatal. *See Watson v. State*, 291 Ark. 358, 724 S.W.2d 478 (1987). In this case there was little chance of searching the wrong property because while the beginning of the affidavit and the search warrant incorrectly identified the address as "40" Nick Springs Road, the affidavit also correctly identified the residence address as "440" Nick Springs Road. Second, agent Clark, who obtained the search warrant, had previously been to the residence and would later, himself, conduct the search. Both this court and the court of appeals have held that a technical error in a search warrant is minimized when the affiant is also the searching officer. *Beshears v. State*, 320 Ark. 573, 898 S.W.2d 49 (1995); *Brown v. State*, 55 Ark. App. 107, 932 S.W.2d 777 (1996). Furthermore, highly technical attacks on search warrants are not favored because the success of such attacks could discourage law enforcement officers from utilizing search warrants. *Watson v. State, supra.* We, therefore, cannot say that the circuit court erred in denying Walley's motion to suppress based on a partially incorrect address listed in the search warrant.

### D. Cumulative Error

██ ██ Finally, Walley asks us to view the warrant and its supporting probable cause in the totality of the circumstances and conclude that the errors cumulatively are sufficient to undermine the integrity of the warrant. We first note that an appellant cannot obtain a reversal based on cumulative error unless the minor issues were actually errors. *Gaines v. State*, 340 Ark. 99, 8 S.W.3d 547 (2000). In this case, there were no multiple errors to accumulate. When the totality of the circumstances surrounding the search warrant and its supporting probable cause are viewed as a whole, rather than finding cumulative error, it is clear that there was suffi-

cient probable cause to search the residence, which in fact did contain a methamphetamine lab. For the foregoing reasons, we affirm the circuit court's denial of Walley's motion to suppress the evidence seized during the September 29, 2000 search of his rented property.

## V. Denial of Bail Pending Appeal

Walley's final point on appeal is that the circuit court erred in denying bail pending appeal because the judge concluded that the appeal did not raise a substantial question of law or fact. We do not address the issues raised by Walley in this point because it is moot, and even if it were not, he waived his opportunity to ask us to review the denial of bail by not raising the issue through a writ of certiorari.

A circuit court is prohibited from issuing a bond pending appeal unless the court finds:

> (A) By clear and convincing evidence that the defendant is not likely to flee or that there is no substantial risk that the defendant will commit a serious crime, intimidate witnesses, harass or take retaliatory action against any juror, or otherwise interfere with the administration of justice or pose a danger to the safety of any other person; and
>
> (B) That the appeal is not for the purpose of delay and that it raises a substantial question of law or fact.

Ark. R. App. P.—Crim. 6(b) (2002); Ark. Code Ann. § 16-91-110(b) (Supp. 2001). Furthermore, the direct appeal of a verdict is not the appropriate vehicle through which a defendant may challenge a denial of appeal bond. Rather "[w]rits of certiorari have been labeled the appropriate vehicle for relief in bail proceedings." *Larimore v. State*, 339 Ark. 167, 170, 3 S.W.3d 680, 682 (1999) (citations omitted); *see also State v. Pulaski County Circuit Court*, 326 Ark. 886, 934 S.W.2d 915 (1996); *Casement v. State*, 318 Ark. 225, 884 S.W.2d 593 (1994); *Duncan v. State*, 308 Ark. 205, 823 S.W.2d 886 (1992) (citing *Thomas v. State*, 260 Ark. 512, 542 S.W.2d 284 (1976)); *Perry v. State*, 275 Ark. 170, 628 S.W.2d 304 (1982).

First, any ruling by us on this issue would not afford any relief to Walley. A case is moot when any decision rendered by this court will have no practical legal effect on an

existing legal controversy. *K.S. v. State*, 343 Ark. 59, 31 S.W.3d 849 (2000). By affirming the circuit court, Walley's issue of bail pending appeal has become moot. We do not decide moot issues. *Shields v. State*, 348 Ark. 7, 17, 70 S.W.3d 392, 397 (2002); *see also Logan v. State*, 299 Ark. 550, 776 S.W.2d 327 (1989) (holding that revocation of an appeal bond was moot where this court affirmed appellant's conviction). The appropriate and meaningful action that Walley could have taken would have been to petition this court for a writ of certiorari separately challenging the circuit court's denial of an appeal bond. Walley did not take this action and has waived the issue of a denial of appeal bond on direct appeal of the verdict.

Based on the foregoing, we conclude that the circuit court did not err in its rulings challenged on appeal, and that substantial evidence supports the convictions of possession of methamphetamine and possession of drug paraphernalia with the intent to manufacture. We, therefore, affirm the circuit court on all points.

Affirm.